

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable C. H. Cavness
State Auditor
Austin, Texas

Dear Sir:

Opinion No. O-5930
Re: Constitutionality of Senate
Bill 271, Acts of the 39th
Legislature, 1st C. S., re-
garding inheritance taxes on
the estate of John Sealy,
deceased.

     We regret our delay in answering your opinion request of March 10, 1944, relative to the above captioned question. However, in view of the importance of your problem and in view of the novel legal questions involved in its solution, we have deemed it wise to subordinate the promptness of our reply to an intensive study and consideration of your request.

     The Act in question reads as follows:

     "Section 1. That the Sealy and Smith Foundation for the John Sealy Hospital, a charitable corporation, incorporated under the laws of this State, for the construction, remodeling, enlarging, equipping and furnishing of the John Sealy Hospital, the property of the State used for Clinical purposes of the Medical Department of the State University, and other hospital building or buildings in the City of Galveston in connection with the John Sealy Hospital and the endowment thereof, for the use of the people of the said City of Galveston, by providing them with

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

the necessary medical care and attention therein,
the legatees under the will of the estate of John
Sealy, deceased, and each of them, be and are here-
by relieved and released from payment of taxes pro-
vided for in Chapter 5, Title 122, Revised Statutes
of Texas, generally known as Inheritance Taxes, and
the State Comptroller and the Tax Collector of Gal-
veston County are hereby ordered and directed not
to collect or attempt to collect such tax or taxes,
which taxes if not so hereby released would be pay-
able out of the part of his estate devised and be-
queathed by said Sealy to said Foundation, and pro-
vided, however, that the City of Galveston shall not
thereby be released from any obligation in or under
a certain lease of said John Sealy Hospital, exe-
cuted by the Board of Regents of the University of
Texas, with said City, dated the 9th day of May,
1913.

"Section 2. Section 1 hereof shall become void
unless the Sealy and Smith Foundation for the John
Sealy Hospital shall within six months after the
passage of this Act enter into an agreement with
the Board of Regents of the University of Texas,
a copy whereof certified as a correct copy by the
President of the University of Texas shall be filed
with the Secretary of State, whereby the Sealy and
Smith Foundation for the John Sealy Hospital shall
agree with said Board of Regents to segregate and
set apart property, or the proceeds thereof, or
cash, or partly property and partly cash, to be
agreed to by and between said Foundation and the
said Regents of a value equal to Seven Hundred
Thousand ($700,000.00) Dollars, the estimated
amount of taxes released by Section 1 hereof and
by which said Foundation shall agree to keep such
property separate from its other assets or property
and to use the income therefrom under the direction
and with the approval of said Regents for said John
Sealy Hospital, or any additions thereto or buildings
to be used in connection therewith, or for any of the
purposes specified in the will of said John Sealy.
The sum hereby remitted shall perpetually be under

the joint control of the Board of Regents of the University of Texas, and the Sealy and Smith Foundation to invest and reinvest the proceeds. Approved, October 1, 1926."

We have ascertained that the conditions contained in Section 2 of the Act were met by the Foundation and by the Board of Regents on January 31, 1927, and that the fund thus created has since been administered in accordance with the provisions of the Act.

Although the Act speaks in terms of a "release" of inheritance taxes, we are of the opinion that the Act as a whole does not accomplish a release or remission of taxes, and hence that the Act does not run afoul of those provisions of our Constitution which prohibit the remission of taxes. Section 1, the Section which purportedly "releases" the taxes, could, as a practical matter, have become effective only when $700,000, "the estimated amount of taxes released by Section 1", was set aside under the terms and conditions of Section 2. Stated differently, any element of a release which might have been inherent in the operation of Section 1 was immediately counter-balanced by the segregation of a sum identified as "the estimated amount of taxes released" by said Section.

We have been informed by representatives of the Comptroller's Department that a preliminary inheritance tax report was filed in connection with the estate of John Sealy, and that prior to the passage of the Act in question, a computation based upon said report revealed that the inheritance taxes approximated $700,000 and in no event could be in excess of such figure. This information, together with the language and the conditional nature of the Act, persuades us that, instead of a release of taxes, the Legislature contemplated and accomplished an arrangement whereby the liability for taxes was extinguished by the receipt and dedication to the purposes stated in Section 2 of a sum which was at least equal to and could not be less than the amount of such liability. Considered as a whole, the Act is an appropriation rather than a release, an appropriation in the manner and for the purposes stated in Section 2 thereof. It remains to be seen whether the Legislature possessed the power to make an appropriation of this kind.

In the case of People v Miner, 46 Ill. 384, an act entitled an act "for the relief" of persons in specified localities was passed by the Illinois legislature. This act provided that the State ad valorem taxes for the next five years were to be collected by the local collectors, but were to be held by them for use in paying for certain levee improvements rather than being turned over to the State treasury. Under constitutional provisions regulating the mode of making appropriations, which provisions are virtually identical with those in Texas, the constitutionality of this act was challenged, and it was argued that an appropriation could only be made from taxes actually received by the treasury and could not be made from taxes in transitu. Characterizing this argument as "specious", the Court stated that just as the legislature possesses the power to await the arrival of money into the treasury and then to appropriate it for levee improvements, so does it possess the power to stop the money in transitu, at some stage in the process of its collection, and to make a similarly authorized appropriation. In the instant situation, the liability for the inheritance taxes under the will of John Sealy had accrued, and the process of collection had progressed to the point where a preliminary tax report had been filed. The Act in question merely stops the taxes at this stage of their collection and appropriates them for stated purposes. If these purposes are purposes for which an ordinary appropriation could have been made, we feel that the mode of making the appropriation is sanctioned by the authority and by the reasoning of the above cited case.

Under the terms of the Act, control of the segregated fund of $700,000 was vested jointly in the Board of Regents of the University of Texas and in the Sealy and Smith Foundation for the John Sealy Hospital, and the income from such fund was to be expended under the direction and with the approval of said Regents "for said John Sealy Hospital, or any additions thereto or buildings to be used in connection therewith, or for any of the purposes specified in the will of said John Sealy." Recourse to the will of John Sealy reveals that the only expenditures therein authorized are for the Hospital, for additions thereto, and for buildings to be used in connection therewith; consequently, the last phrase in the above quotation in no way broadens the power of expenditure contained in the first three phrases, and expenditures from said fund must be confined to the purposes named in such phrases.

As stated in the Act, the John Sealy Hospital is, and was at the time of the passage of the Act, owned by the State of Texas and used for clinical purposes by the Medical School of the University of Texas. Similarly, we have ascertained that the buildings in connection with the Hospital are and were used for educational purposes by said School. It is clear, we feel, that the Hospital and its attendant buildings are used for a "governmental purpose" of the State, and that expenditures from the income of the fund in question are authorized only in connection with and in the furtherance of such purpose.

Section 51 of Article III of our Constitution provides in part as follows:

"The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporations whatsoever . . ."

Since the Sealy and Smith Foundation for the John Sealy Hospital is a private corporation, incorporated for charitable purposes, the contention might be made that the appropriation in question violates the above quoted prohibition of our Constitution. There is, we feel, no merit in such contention. In construing this provision of our Constitution, our courts have consistently focused their attention upon the question of whether or not the grant is for a public purpose rather than upon the question of whether or not some individual or municipal or other corporation receives technical custody of the grant. Thus, with reference to this provision, our Commission of Appeals has stated in Road District No. 4, Shelby County v. Allred, 68 S. W. (2d) 164, 169:

"It is the settled law of this state that the above-quoted constitutional provision is intended to guard against and prohibit the granting or giving away of public money except for strictly governmental purposes. The prohibition is an absolute one, except as to the class exempted therefrom, and operates to prohibit the Legislature from making gratuitous donations to all kinds of corporations, private or public, municipal or political. Bexar County v. Linden, 110 Tex. 339, 220 S. W. 761. It is clear from the above that a road district is a corporation within the meaning of the above-quoted constitutional provision.

"It is also the settled law of this state that the above-quoted constitutional provision does not prevent the appropriation or granting of state funds to municipal and political corporations when the money is granted to be used for a governmental purpose. (citing cases)" (Emphasis added)

Thus, although the literal wording of the Constitution prohibits all grants to a municipal or other corporation, our courts have, with respect to municipal and political corporations, interpreted this provision as prohibiting only those grants which are not for a governmental purpose. That a similar interpretation is applicable to private charitable corporations of the type under discussion is illustrated by the case of Conley v. Daughters of the Republic, 156 S. W. 197, 157 S. W. 937. Under the familiar facts of this case the State purchased the Alamo for the use and enjoyment of the people of Texas, and, under legislative direction, the governor delivered such property to the custody and care of the Daughters of the Republic of Texas, a private corporation organized for educational purposes. In upholding this action of the legislature, the Court, after stating the powers of the State over its property, concluded:

"This question is asked: 'Should a state commit its interests to corporations?' This court has naught to do with the policy of the state on that question."

Although not involving a private corporation, the case of King v. Sheppard, 157 S. W. (2d) 682 (error refused) throws additional light upon this problem. In this case the contention was made that the above quoted constitutional provision prohibited the State from turning over the title, care and custody of State land to the National Park Service of the Federal Government for use as a National Park. In rejecting this contention, the Court quoted from and adopted the opinion of the Tennessee Supreme Court in Malone v. Peay, 159 Tenn. 321, 17 S. W. (2d) 901, as follows:

"'Moreover, a transfer of the title to lands from the state to the United States for park purposes is not a divestiture of the right of use. The beneficial rights of the people of Tennessee are in no sense impaired. Under our dual form of government, the citizens of Tennessee are citizens of

> the United States. The passing of this property from one government to the other involves no loss to the citizen or taxpayer. The object of the constitutional inhibition invoked was to prevent a loss to the state by reason of the loaning or giving of its credit. Here not only can no loss result, but the state, considered as a political entity, is relieved of a continuing expense of upkeep, while the rights and privileges of this great park system will be preserved to the people of Tennessee.'

"We think this decision is sound and should be followed as the law of this case." (Emphasis added)

We feel that the cumulative effect of these decisions is to demonstrate that the inhibitions of Section 51 of Article III of the Constitution are operative only when the grant by the State is, or can be, a diversion of State property or funds to non-governmental purposes. Conversely, so long as the grant is for a governmental purpose, and can only be used for such purpose, we feel that this Section is inoperative.

In the instant situation, the Sealy and Smith Foundation is but a joint custodian of the fund in question, possessing at most only the powers of a joint trustee with respect to such fund. Moreover, the Foundation may expend such fund only for governmental purposes and may make such expenditures only under the direction and with the approval of the Board of Regents of the University of Texas. In such a situation, the appropriation by the Legislature cannot be said to be a "gratuitous donation" to a corporation. Neither can it be said that the appropriation divests the citizens and taxpayers of Texas of the right of use of the fund or impairs their beneficial rights thereto. Under the terms of the appropriation, the rights and privileges of the State with respect to the fund are fully preserved.

Apart from the matters heretofore discussed, we can perceive no serious questions which might be raised against the constitutionality of the Act under discussion. Consequently, you are respectfully advised that the Act is in all ways valid and constitutional. This conclusion renders unnecessary an answer to your inquiry as to the nature of the action which should be taken if the Act were to be held unconstitutional.

Hon. C. H. Cavness, Page 8

Trusting that the foregoing fully answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

APPROVED NOV 3 1971

ATTORNEY GENERAL OF TEXAS

By R. Dean Moorhead

R. Dean Moorhead
Assistant

RDM:fo



APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN